IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DAKOTA F.[1], ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Civil Action No. 7:20-CV-242 |
| ) | |
| KILOLO KIJAKAZI,[2] ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff Dakota F. ("Dakota") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that she was not disabled and therefore ineligible for child's insurance benefits ("CIB")[3] and supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 402(d), 1381–1383f, 20 C.F.R. 404.350. Dakota alleges that the Appeals Council erred by refusing to consider additional medical evidence submitted after the Administrative Law Judge's ("ALJ") decision. Dakota further alleges that the ALJ erred by failing to properly assess her mental impairments and weigh the medical opinions.

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

[3] A claimant is entitled to child's benefits on the earnings of an insured person who is entitled to old-age or disability benefits or who has died if the claimant: (1) is the insured person's child; (2) is dependent upon the insured; (3) applies; (4) is unmarried; and, (5) is under age 18, is 18 years or older and has a disability that began before she became 22 years old, or is 18 years or older and qualifies for benefits as a full-time student. 20 C.F.R. § 404.350(a).

I agree that the Appeals Council erred by refusing to consider additional medical evidence submitted after the ALJ's decision. Accordingly, I **RECOMMEND GRANTING in part** Dakota's Motion for Summary Judgment (Dkt. 12), **DENYING** the Commissioner's Motion for Summary Judgment (Dkt. 14), and **REMANDING** this matter for further administrative consideration.

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Dakota failed to demonstrate that she was disabled under the Act.[4] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). However, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" because the court is "left to guess [at] how the ALJ arrived at his conclusions"); see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's

---

[4] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

limitations would cause him to experience his claimed symptoms during work and if so, how often) (citations omitted).

## **CLAIM HISTORY**

Dakota protectively filed for CIB and SSI on October 27, 2016,[5] claiming her disability began on January 1, 2015,[6] due to attention deficit hyperactivity disorder ("ADHD"), bipolar, epilepsy, learning disability, oppositional defiance disorder, borderline personality disorder, and polycystic ovarian syndrome. R. 345–56, 362–73. Dakota's application was denied at the initial and reconsideration levels of administrative review. R. 217, 254. In November 2018, ALJ Joseph Scruton held an administrative hearing to consider Dakota's claims for CIB and SSI. R. 136–68. Counsel represented Dakota at the hearing, which included testimony from vocational expert John Newman. Id. On February 14, 2019, the ALJ entered his decision analyzing Dakota's claims under the familiar five-step process[7] and denying her claim for benefits. R. 30–56.

The ALJ found that Dakota was younger than 22 on her alleged onset date and that she suffered from the severe impairments of bipolar disorder, anxiety disorder, mood disorder, ADHD, personality disorder, history of polycystic ovarian disorder, seizure disorder,

---

[5] Dakota previously filed a claim for CIB and SSI in May 2014 and September 2015, respectively. These claims were denied initially and on reconsideration. R. 33. The ALJ dismissed these claims, id., and Dakota does not address them in her Motion for Summary Judgment, Dkt. 12.

[6] Dakota amended her alleged onset date from August 1, 2008 to January 1, 2015 at her administrative hearing. R. 34.

[7] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

and hypertension. R. 36. The ALJ determined that these impairments, either individually or in combination did not meet or medically equal a listed impairment. Id. The ALJ specifically considered listing 11.02 (Epilepsy), 4.00(H)(1) (other cardiovascular impairments), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.08 (personality and impulse-control disorders), and 12.11 (neurodevelopmental disorders). R. 36–37. The ALJ found that regarding her mental impairments, Dakota had moderate limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. R. 37–39.

The ALJ concluded that Dakota retained the residual functional capacity ("RFC") to perform a limited range of light work. R. 39. Specifically, Dakota can concentrate, focus, and pay attention during the workday for routine, repetitive tasks of a simple nature, requiring short, simple instructions to be fulfilled. Id. Dakota cannot have any public interaction requirements and interactions with others should be predominately brief, one to two-minute encounters at most during the workday. Id. She is able to respond to routine work changes, but can have no exposure to dangerous work hazards such as unprotected heights or moving machinery, and she may incur one day per month average of unscheduled absences and up to ten percent unscheduled off task performance due to the impact of her impairment. Id. The ALJ determined that Dakota had no past relevant work, but she could perform jobs that exist in significant numbers in the national economy, such as assembler, packer, and sorter. R. 49.

After the ALJ denied her claim, Dakota appealed his decision and submitted additional evidence to the Appeals Council. R. 2, 18–29, 57–135. The Appeals Council declined to consider this additional evidence and denied her request for review on February 26, 2020. R. 1–4.

**ANALYSIS**

Dakota alleges that the Appeals Council erred by refusing to consider additional evidence submitted after the ALJ's decision. Dakota further alleges that the ALJ erred by failing to properly assess her mental impairments and weigh the medical opinions.

**A. Medical History**

1. <u>Mental Health Treatment</u>

Dakota has a history of anger-based outbursts well before her alleged onset date. <u>See</u>, <u>e.g.</u>, R. 457, 700, 703, 755. These outbursts occurred both at home and at school and she was admitted for psychiatric hospitalization on a couple of occasions. R. 457, 677, 700, 712, 1044, 1103. She received youth case management services from Mount Rogers Community Services Board ("Mount Rogers") during this period.

In May 2015, after Dakota's alleged onset date, she presented at Mount Rogers for intake into its counseling program. R. 1104. She attended several counseling and psychiatric sessions between May and October 2015. R. 1107, 1112, 1114. Her mental status examinations during this period were largely normal, and her providers treated her with medication and cognitive behavioral therapy. R. 1107, 1112, 1114; <u>see also</u> R. 1129–32, 1151 (finding Dakota's mental state largely normal during several appointments with her primary care providers). Dakota was discharged from Mount Rogers in October 2015 for failure to maintain contact. R. 1121, 1124. Dakota was readmitted into the Mount Rogers program in April 2016, but she was again discharged for failure to comply. R. 1283.

In November 2015, Dakota established care at Galax Family Practice, and she reported concerns about her depression, irritability, binge eating, and poor concentration. R. 1221. She was diagnosed with depression and treating providers started her on new medication. R. 1222. Between January 2016 and January 2018, Dakota attended regular appointments at Galax Family

Practice where she reported concerns regarding her mood and binge eating. See, e.g., R. 1203, 1205, 1217, 1241, 2070. Treating providers often found her mood and affect to be normal, but occasionally reported a depressed mood or flat affect. See R. 1205, 1208, 1253 (normal mood and affect); 1203, 1241, 2070 (depressed mood or affect).

On February 26, 2018, Dakota presented to the emergency room for anxiety after having a fight with her boyfriend. R. 1523–82, 2100. Treating physicians assessed her with anxiety, bipolar, and depression, and she was told to follow-up at Mount Rogers the next day. At her February 27 follow-up at Mount Rogers, Dakota expressed interest in admission to Cornerstone, the Mount Rogers Crisis Stabilization Unit, but there were no beds available, and she was assigned a case manager. R. 1292–93. On February 28, Dakota followed-up at Galax Family Health and reported heightened depression and binge eating. R. 2100. She presented with a depressed mood and flat affect and her treating physician adjusted her medications. R. 2101–02.

Dakota attended regular appointments with her case manager at Mount Rogers between March and July 2018 and voluntarily attended Cornerstone for 15 days. See, e.g., R. 1295–302, 1317, 2153, 2111–13. During this period, Dakota reported some anxiety and depression. R. 2111, 1303. She also reported interpersonal problems with family and her boyfriend and his daughter, but she suggested some improvement over time. R. 2111, 1303, 1313, 1315. In July 2018, Dakota reported that she was arrested after arguing with her boyfriend's family and reported she attended Cornerstone. R. 1317, 1325. Her case manager referred her for counseling. R. 1318. In August 2018, Dakota began counseling with Catherine Burcham, LCSW, and attended weekly group therapy sessions between August 2018 and early 2019. See, e.g., R. 1269. During this period, Dakota reported to the emergency room for a suspected overdose after fighting with a friend. R. 1603–2067. The treating physicians recommended a psychiatric admission to which

6

Dakota agreed. R. 1606. Her discharge diagnoses included overdose, suicidal ideation, and bipolar disorder. R. 1734. Dakota reported feeling better upon release and that medication changes were beneficial.[8] R. 2152.

2.  Opinion Evidence

Angelia Berry, Psy.D, conducted a psychological evaluation in 2009, well before Dakota's amended alleged onset date. R. 673–76. Dr. Berry assessed Dakota with Disruptive Behavior Disorder, ADHD, and Depressive Disorder. R. 675. She recommended counseling, academic support services, and evaluation for learning disabilities. R. 676. The ALJ did not address or weigh this opinion in his decision.

Mayda Strong, Ph.D., conducted a consultative examination in December 2014, several weeks before Dakota's amended alleged onset date. R. 1096–101. Dr. Strong assessed Dakota with Bipolar I disorder, unspecified anxiety disorder, specific learning disorders in reading and written expression, ADHD, and borderline intellectual functioning. R. 1100. Dr. Strong noted that Dakota's cognitive functioning is unlikely to improve and that while she functioned well within the limited and structured examination, that "[s]he is not likely to be able to attend a workplace or perform even simple and repetitive tasks consistently, nor complete a 'normal' workweek without being impacted by her multiple psychological issues." R. 1101. Dr. Strong also stated that Dakota had few social contacts and that she would have difficulty interacting with coworkers and the public and that she would be unable to cope with the "usual stresses

---

[8] After the ALJ denied her claim, Dakota submitted treatment records from Mount Rogers, dating September 2018 to April 2019, to the Appeals Council. R. 18–26, 57–135. The Appeals council found that medical records dating between September 2018 and February 2019 would not change the outcome of the decision and that records dating between March 2019 and April 2019 did not relate to the period at issue. R. 2. These records show continuing case management and group therapy services.

encountered in the competitive workplace." Id. The ALJ did not address or weigh this opinion in his decision.

State agency psychologist Howard Leizer, Ph.D., reviewed the record in March 2017, finding Dakota had moderate limitations in her ability to understand, remember, or apply information, interact with others, and concentrate, persist, or maintain pace and a mild limitation in her ability to adapt or manage herself. R. 187. Regarding her ability to interact with others, Dr. Leizer found Dakota moderately limited in her ability to respond to criticism from supervisors, get along with coworkers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior. R. 193. Dr. Leizer noted that while Dakota had a history of anger-based outbursts that these incidents largely occurred when she was a teenager and that she is stable on current medication. R. 187. The ALJ gave Dr. Leizer's opinion some weight. R. 46–47. State agency psychologist Leslie Montgomery, Ph.D., reconsidered the record in June 2017, finding Dakota had moderate limitations in all functional areas. R. 228. Regarding Dakota's ability to interact with others, Dr. Montgomery found Dakota only moderately limited in her ability to interact appropriately with the general public, finding her not significantly limited in her ability to ask questions, respond to criticism, get along with coworkers, or maintain socially appropriate behavior, noting Dakota has been appropriate in recent interactions, but she has a history of difficulty interacting with others. R. 235. On these grounds, Dr. Montgomery reviewed consultative examiner Dr. Strong's opinion, giving it little weight, stating "[the exam] was given over two years ago and based on a one-time assessment." R. 230, 235. The ALJ gave Dr. Montgomery's opinion great weight. R. 46–47.

State agency physicians Joseph Duckwall, M.D., and Jack Hutcheson, M.D., both found that Dakota was capable of medium work with certain exertional, postural, and environmental limitations. R. 190–92, 194, 232–33. The ALJ gave these opinions some weight. R. 47–48.

Pamela Tessnear, Ph.D., performed a psychological evaluation and wrote an opinion in September 2018. R. 2179–83. On evaluation, Dakota reported a good mood and minimal anxiety but noted some issues with anger and concentration. R. 2180. Dr. Tessnear assessed Dakota with ADHD and gave her rule out diagnoses of mood and personality disorder. R. 2183. She found that Dakota's presentation "suggests minimal psychiatric impairment," but she noted that because of her impulsivity and distractibility that she had "difficulty following instructions and attending to details" and is unlikely to correct her mistakes. Id. Regarding Dakota's anger-based outbursts, Dr. Tessnear reported that most problems involved family members but that it is likely "that in the workplace her irritability and poor anger control would create problems with co-workers and supervisors." Id. The ALJ gave Dr. Tessnear's opinion some weight. R. 47.

Catherine Burcham, LCSW, completed a mental impairment questionnaire in March 2019, approximately one month after the ALJ denied Dakota's claim for disability. R. 27–29. Ms. Burcham assessed Dakota with Bipolar II disorder, borderline personality disorder, intermittent explosive disorder, and ADHD. R. 27. She reported that Dakota had multiple marked and extreme limitations, primarily related to her ability to work with others, maintain concentration, and respond to changes and stress. R. 27–28. Regarding Dakota's ability to interact with others, Ms. Burcham found Dakota had marked limitations in her ability to interact with the general public and maintain socially acceptable behavior. R. 28. Ms. Burcham found that functionally, Dakota had no restriction on her activities of daily living, but that she had marked difficulties in maintaining social functioning and that she would be absent more than

four days per month. Ms. Burcham related Dakota's limitations back to July 2013. R. 29. The Appeals Council found that Ms. Burcham's opinion "d[id] not relate to the period at issue." R. 2.

### B. Post-Hearing Evidence

Dakota argues that the additional evidence presented to the Appeals Council following the ALJ's decision, specifically, a questionnaire completed by Ms. Burcham, Dakota's licensed clinical social worker, merits remand.[9] Pl.'s Br. at 10–14, Dkt. 13. Ms. Burcham completed the questionnaire in March 2019, approximately one month following the ALJ's decision, finding Dakota had marked limitations in her ability to maintain social functioning. R. 27–29. Dakota argues that limitations identified by Ms. Burcham would preclude competitive employment and that the questionnaire "depicts [Dakota] as far more impaired in her functional abilities than indicated in the RFC assessment," and as such, the questionnaire should be considered by the ALJ. Pl.'s Br. at 11, Dkt. 13. The Appeals Council wrote regarding Ms. Burcham's questionnaire that the "additional evidence does not relate to the period at issue." R. 2.

The "Appeals Council must consider evidence submitted with the request for review in deciding whether to grant review 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Sec'y Dep't Health & Human Servs., 953 F.2d 93, 95–96 (4th Cir. 1991) (quoting Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990)). A claimant must also show good cause for not submitting the evidence at least five days before the ALJ hearing. 20 C.F.R. §§ 404.970, 416.1470. Evidence is new if it is not duplicative or cumulative and evidence is material "if there is a reasonable [probability] that it would have changed the outcome." Wilkins, 953 F.2d at 96; Hawks v. Berryhill, 1:17CV1021, 2018 WL 6728037, at *4–6 (M.D.N.C. Dec. 21, 2018) (explaining change in

---

[9] Dakota does not raise any specific arguments about the Mount Rogers treatment records dating from September 2018 to April 2018. See Pl.'s Br. at 10–14, Dkt. 13.

10

regulations). The Appeals Council need not review or consider new evidence that relates only to a time after the ALJ issues the decision. See 20 C.F.R. § 404.970; Norris v. Colvin, 142 F. Supp. 3d 419, 422 (D.S.C. 2015) (finding that evidence may relate back to the period before the ALJ's decision even if it postdates the decision). When the Appeals Council denies review, this denial makes the ALJ's decision final, at which point, it is the decision of the ALJ, and not the procedural decision of the Appeals Council to deny review, that is subject to judicial scrutiny. See 20 C.F.R. §§ 404.967–981; Bowles v. Barnhart, 392 F. Supp. 2d 738, 742–43 (W.D. Va. 2005).

I must consider whether there was good cause for Dakota's not submitting the questionnaire at least five days before the ALJ hearing and whether the questionnaire was new, material, and related back to the period on or before the date of the ALJ's decision. See Wilkins, 953 F.2d at 95; Vickie W. v. Berryhill, No. 7:17cv324, 2018 WL 4604038, at *4 (W.D. Va. Sept. 25, 2018).

Dakota met the required showing of good cause for failing to submit Ms. Burcham's questionnaire earlier. Ms. Burcham did not complete the questionnaire until March 2019, one month after the ALJ rendered his decision. See Pouzar v. Saul, No. 7:19cv00029, 2020 WL 5526508, at *8 (W.D. Va. Sept. 15, 2020); Sowers v. Saul, 7:18CV00573, 2020 WL 1539289, at *3 (W.D. Va. Mar. 31, 2020). Additionally, Dakota points to her consistent efforts to secure the questionnaire, including requests made months before the administrative hearing date. See R. 20, 143–45, 427, 429–30; 20 C.F.R. § 404.970(b)(3)(iv) (finding good cause when claimant "actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing").

11

Ms. Burcham's questionnaire also plainly relates back to a period before the date of the ALJ's decision. See R. 27–29. Ms. Burcham related her opinion back to July 2013, well before the ALJ's February 2019 decision. See Vickie W., 2018 WL 4604038, at *4 (finding questionnaire related to a period before the date of the ALJ's decision when doctors related their opinions back).

Ms. Burcham's questionnaire is also new. The record did not contain Ms. Burcham's opinions during the administrative hearing and the ALJ did not have the benefit of the questionnaire in making his decision. Though the ALJ considered several opinions from the consultative examiner and state agency doctors, the record contained no opinion from a treating provider. See Mabel H. v. Saul, No. 6:18–cv–68, 2019 WL 2997853, at *4 (W.D. Va. June 24, 2019) (finding opinion "new, as it is the only opinion of a treating physician in the record").

Finally, Ms. Burcham's questionnaire is material, as there is a reasonable probability that it would have changed the outcome of the ALJ's decision. Dakota participated in weekly group therapy sessions with Ms. Burcham starting in August 2018, over three months before Dakota's administrative hearing, and Dakota continued these weekly sessions well into 2019. See, e.g., R. 1269. Ms. Burcham indicated that Dakota had marked and extreme limitations in her mental ability to do unskilled work and had marked limitations in her functional ability to maintain social functioning. Dkt. 27–29.

The Commissioner argues that Ms. Burcham's questionnaire "simply contradicts the ALJ's decision." Comm'rs Br. at 19, Dkt. 15. While Ms. Burcham's opinion certainly conflicts with the ALJ's decision and the state agency psychologists' opinions, the questionnaire plainly supports other opinion evidence in the record.

12

Importantly, the ALJ gave great weight to the opinion of state psychologist Dr. Montgomery, finding that Dakota experienced only moderate limitations in all functional areas and that she was capable of simple, unskilled work. The ALJ did not explicitly consider, cite to, or weigh the opinion of Dr. Strong, which was authored weeks prior to Dakota's alleged onset date.[10] Nevertheless, Dr. Montgomery reviewed this opinion and specifically discounted it noting that it was a one-time assessment performed in late 2014. It is likely that the ALJ discounted Dr. Strong's opinion on these same grounds given the great weight he assigned Dr. Montgomery's opinion. Importantly, Ms. Burcham's opinion corroborates the opinion of Dr. Strong, which is significant given that Ms. Burcham was a regular treating provider whose opinion was authored several years later. Both Ms. Burcham and Dr. Strong found, for instance, that Dakota was unable to cope with normal work stress or complete a normal workweek without being impacted by her psychological conditions. See R. 27–29, 1096–1101. Further, both expressed some concern about her ability to complete even simple and repetitive tasks with any consistency. See id.; see also R. 2182 (Dr. Tessnear's evaluation stating "[Dakota] has difficulty following instructions and attending to details because of impulsivity and distractibility. She is not likely to catch her mistakes or correct them").

Though perhaps less consistent, Ms. Burcham's opinion also corroborates aspects of Dr. Tessnear's opinion, especially her concerns about Dakota's impulsivity, distractibility, and potential interpersonal issues with co-workers and supervisors. See R. 27–29, 2184. This again

---

[10] While Dr. Strong's opinion was written prior to the alleged disability onset date, that does not necessarily excuse the ALJ's failure to consider and weigh it. The regulations require the ALJ to consider all evidence in the record, 20 C.F.R. § 404.1520(a)(3), and to weigh all medical opinions when making a disability determination, id. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). See Treadwell v. Colvin, No. 5:13-CV-370-FL, 2014 WL 4656852, at *10 (E.D.N.C. Sept. 17, 2014), adopted by 2015 WL 5714912 (E.D.N.C. Sept. 29, 2015); see also Lewis v. Saul, No. 5:19-cv-02298-DCN, 2021 WL 1040512, at *3 (D.S.C. Mar. 18, 2021) ("An ALJ's failure to consider pre-disability onset date evidence is contrary to the clear instruction of the Social Security Regulations and the relevant case law.").

could likely alter the ALJ's decision. The ALJ assigned Dr. Tessnear's opinion only some weight, noting that limitations identified by Dr. Tessnear were "accounted for by limiting her to time off task and absences." R. 47. The ALJ could very well view Dr. Tessnear's conclusions differently when considering Ms. Burcham's specific conclusions regarding Dakota's likely time off-task and absence rate. See R. 27–29. This is especially so considering the vocational expert's testimony regarding absences and off-task behavior in the workplace. R. 163–64, 166–67.

Additionally, while Ms. Burcham, a licensed clinical social worker, is not an "acceptable medical source," the ALJ would likely recognize the importance of her opinion as a treating provider—especially given that Ms. Burcham's opinion remains the only opinion from a treating provider in the record. See, e.g., R. 47 (ALJ noting that "[t]reatment providers did not generally offer opinions on [Dakota's] behalf"). And though a non-acceptable medical source, both the social security regulations and courts recognize that opinions from such providers "'are important' and may offer insight into the severity of an individual's functional limitations. The regulations provide that an ALJ will consider non-acceptable medical source opinions and 'generally should explain the weight given' to them." Edwin M. v. Saul, No. 4:19-cv-00046, 2021 WL 1565415, at *8 n.8 (W.D. Va. Apr. 21, 2021) (citing SSR 06-03p, 2006 WL 2329939); Elizabeth G. v. Saul, No. 5:18-cv-00145, 2020 WL 3108707, at *7 (W.D. Va. Mar. 5, 2020).

I note that, even had I concluded the Appeals Council considered the questionnaires of Ms. Burcham, remand would still have been necessary here. This is because, as described, there is evidence in the record that both conflicts with and supports her opinion. The evidence here is not one-sided, but instead the probative value of competing records and opinions must be assessed, which is "quintessentially the role of the fact finder." Meyer, 662 F.3d at 707; see also Davis v. Astrue, No. CIV. A. 3:07CV00010, 2008 WL 2872214, at *3 (W.D. Va. July 24, 2008)

(citations omitted) ("[I]f additional evidence has been submitted that creates a conflict, is contradictory, or calls into doubt a decision based on the prior medical records and the Appeals Council has not explained its reason to deny review, the case must be remanded to the Commissioner to weigh and resolve the conflicting evidence.").

Because I find that remand is warranted on the Appeals Council's failure to consider additional medical evidence submitted after the ALJ's decision, Dakota's additional allegations of error will not be decided. See Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments).

## CONCLUSION

For the foregoing reasons, I **RECOMMEND GRANTING in part** Dakota's motion for summary judgment, **DENYING** the Commissioner's motion for summary judgment, and **REMANDING** this case pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

The Clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation which must be filed within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including a waiver of the right to appeal.

Entered: August 6, 2021

*Robert S. Ballou*

Robert S. Ballou
U.S. Magistrate Judge

15